931 A.2d 595

IN RE REFERENDUM PETITION TO
REPEAL ORDINANCE 04–75.

Argued May 1, 2007—Decided September 26, 2007.

448

*Rocky L. Peterson*, argued the cause for appellants, The Honorable Mayor Douglas Palmer of the City of Trenton and The City Council of the City of Trenton (*Hill Wallack*, attorneys; *Mr. Peterson, Patrick D. Kennedy, Megan McGeehin Schwartz* and *Ryan P. Kennedy*, on the briefs).

*George T. Dougherty*, argued the cause for respondents, Russell Derricott and the Committee of Protest Petitioners (*Katz & Dougherty*, attorneys).

Justice ALBIN delivered the opinion of the Court.

■ The Legislature has conferred on the voters of Faulkner Act municipalities,[1] such as Trenton, "the power of referendum," the right to test a challenged ordinance in the crucible of the democratic process. *See N.J.S.A.* 40:69A–185. When a referendum petition is properly filed, the voters have the final say in approving or rejecting an ordinance at the ballot box.

In this case, the Trenton City Council enacted Ordinance 04–75, which established a new organizational table for the police depart-

---

[1] Municipalities that elect to organize themselves under the Faulkner Act may choose between four plans of government: the mayor-council plan, the council-manager plan, the small municipality plan, and the mayor-council administrator plan. *See N.J.S.A.* 40:69A–1 to –210.

ment and set a salary range for the chief of administrative services. A Trenton citizens group filed a referendum petition that required the ordinance to be submitted for ballot approval. The City Council and the Mayor of Trenton then filed a complaint seeking a declaratory judgment that the ordinance was not subject to referendum pursuant to *N.J.S.A.* 40:69A–185.

Relying on case law that holds that only "legislative" ordinances, as opposed to "administrative" ordinances, are subject to referendum, the trial court concluded that the part of the ordinance restructuring the police department was administrative in nature and therefore not subject to the referendum statute. The Appellate Division reversed, finding it to be legislative and subject to voter approval in a referendum.

█ We affirm, not because Trenton Ordinance 04–75 is a legislative as opposed to administrative ordinance, but because *N.J.S.A.* 40:69A–185 states in clear, plain language that "any ordinance passed by the council," challenged by a properly filed referendum petition, must be approved or rejected at the polls. The judicially-created legislative/administrative distinction is not supported by the statute, its legislative history, or its place in the overall statutory scheme. Only the Legislature can make exceptions to the statutory mandate that "any ordinance" is subject to referendum. Because there is no applicable statutory exception, Ordinance 04–75 is subject to the referendum process and must be placed on the ballot for voter review.

I.

A.

On September 2, 2004, the Trenton City Council enacted Ordinance 04–75, which sets forth a restructuring plan for the City of Trenton's police department. Ordinance 04–75 provides that a police director shall head the police department with the assistance of a chief of administrative services. The ordinance also outlines the police department's command hierarchy and enumer-

ates the number of positions for each rank: 8 to 13 captains, 25 to 30 lieutenants, 35 to 45 sergeants, and 270 to 290 patrol officers. Additionally, the ordinance establishes the salary range for the chief of administrative services, provides that both he and the police director are eligible for annual stipends at the mayor's discretion, and authorizes the police director to structure the police department in accordance with the organizational table.

Prior to the enactment of Ordinance 04–75, a 1999 ordinance, approved by the voters in a referendum, eliminated the position of chief of police and replaced it with the new office of police director. Trenton, N.J., Ordinance 99–52 (June 22, 1999). At the time of Ordinance 04–75's passage, the police department's table of rankings consisted of 3 deputy chiefs, 10 captains, 25 lieutenants, 24 sergeants, and an indefinite number of police officers. Ordinance 04–75, among other things, eliminated the position of deputy chief, then held by three career officers, and increased the numerical range of positions for each rank, including by three the number of captain positions. Before the ordinance took effect, the police director advised the three deputy chiefs that they had the option of being laid off or accepting a demotion to the position of captain.

On September 21, 2004, Trenton's City Clerk informed the City Council that his office had accepted a referendum petition seeking to repeal Ordinance 04–75. On October 7, 2004, the City Clerk certified that the referendum petition complied with the statutory requirements of *N.J.S.A.* 40:69A–185 to –191 and that he would order that the ordinance be placed on the ballot unless the City Council repealed it within twenty days.[2]

Thereafter, plaintiffs Mayor Douglas Palmer and the City Council (collectively the "City") obtained an order to show cause and

---

[2] *N.J.S.A.* 40:69A–191 provides that

[i]f within 20 days of the submission of a certified petition by the municipal clerk the council shall fail to pass an ordinance requested by an initiative petition in substantially the form requested or to repeal an ordinance as requested by a referendum petition, the municipal clerk shall submit the ordinance to the voters. . . .

filed a verified complaint in lieu of prerogative writ, seeking a declaratory judgment that the referendum petition was void because it violated *N.J.S.A.* 40:69A–185 to –191. The complaint named as indispensable parties the City Clerk, as well as Russell Derricott, Howard Allaire, Stephanie J. Bradberry, Earl J. Hill, and Anthony Pasqua (collectively the "Committee of Petitioners"), who were believed to be the organizers of the citizens group behind the referendum drive. The City claimed that Ordinance 04–75 was not "subject to recall under the referendum statutes set forth in the Faulkner Act." The Committee of Petitioners, in its answer, disagreed.

### B.

The trial court, in a written opinion, determined that the part of Ordinance 04–75 that organized the chain of command of the police department, designated the numerical range of officers to be assigned to each rank, and eliminated the deputy chief position was "an administrative, not legislative decision and comport[ed] with the statutory authority set forth in *N.J.S.A.* 40A:14–118," and therefore was not subject to referendum under *N.J.S.A.* 40:69A–185. Relying on a line of cases, beginning with *Cuprowski v. City of Jersey City,* 101 *N.J.Super.* 15, 23, 242 *A.2d* 873 (Law Div.), *aff'd o.b.,* 103 *N.J.Super.* 217, 247 *A.2d* 28 (App.Div.), *certif. denied,* 53 *N.J.* 80, 248 *A.2d* 433 (1968), which held that only legislative ordinances are subject to referendum, the court concluded that an ordinance dictating the organizational structure of a police department is administrative in nature and thus exempt from a referendum challenge.

On the other hand, the court found that the part of the ordinance increasing the salary range of the chief of administrative services had to be submitted to the voters for ratification pursuant to *N.J.S.A.* 40A:9–165. Under that statute, an increase in salary of a managerial municipal employee, fixed by ordinance, must be submitted for voter approval if a petition containing the

signatures of at least five percent of the municipality's registered voters protesting the ordinance is properly filed.

The Committee of Petitioners then appealed.

## C.

Reversing the trial court, the Appellate Division concluded that an ordinance establishing a police department's table of organization and the salary range of its officers is subject to a referendum challenge. *In re Referendum Petition to Repeal Ordinance 04-75*, 388 *N.J.Super.* 405, 409, 415, 908 *A.*2d 846 (App.Div.2006). The panel observed that the Legislature has conferred on the voters of a Faulkner Act municipality, like Trenton, the authority to " 'approve or reject at the polls ... any ordinance passed by the council, against which a referendum petition has been filed.' " *Id.* at 413, 908 *A.*2d 846 (alteration in original) (quoting *N.J.S.A.* 40:69A–185). The panel, however, noted that the statutory language "any ordinance" has been construed as meaning not "all ordinances." *Ibid.* It adhered to the legislative/administrative dichotomy first enunciated in *Cuprowski*, which stated that the Legislature intended the right of referendum to apply only " 'to ordinances of a legislative nature' " and not to " 'resolutions or ordinances of an executive or administrative nature.' " *Ibid.* (quoting *Cuprowski, supra*, 101 *N.J.Super.* at 23, 242 *A.*2d 873).

The panel in this case observed that the difficulty in characterizing an ordinance as either legislative or administrative had created an "apparent conflict" between Appellate Division panels. *Id.* at 413–14, 908 *A.*2d 846. In seemingly conflicting cases, both citing *Cuprowski*, the panel in *D'Ercole v. Mayor and Council of Norwood*, 198 *N.J.Super.* 531, 487 *A.*2d 1266 (App.Div.1984), held that an ordinance authorizing a municipality to lease a firehouse for twenty years was an administrative act not subject to referendum, whereas the panel in *Menendez v. City of Union City*, 211 *N.J.Super.* 169, 511 *A.*2d 676 (App.Div.1986), determined that an ordinance increasing the number of fire captains and creating a new fire protection subcode official was a legislative act subject to

referendum. *In re Referendum Petition, supra,* 388 *N.J.Super.* at 413–14, 908 *A.*2d 846. The panel here sided with the *Menendez* approach, maintaining that the " 'right of referendum' " should be liberally construed to further " 'the legislative policy of encouraging citizen interest and participation in local government.' " *Id.* at 414–15, 908 *A.*2d 846 (quoting *Menendez, supra,* 211 *N.J.Super.* at 172, 511 *A.*2d 676). Indeed, for the purpose of bringing "some predictability" in classifying ordinances, the panel applied a default rule, stating that when "it is difficult to determine" whether an ordinance constitutes a legislative or administrative act, "the legislatively declared policy preference for public participation must apply to favor the referendum mechanism." *Id.* at 417–18, 908 *A.*2d 846.

The panel also cited favorably the distinction *Menendez* drew between legislative and administrative ordinances:

> When a municipal governing body has latitude within its discretion in adopting the specific provisions of an ordinance, its enactment is legislative and subject to referendum, even though its authority to legislate on that subject has been delegated to it by State law. When a municipal governing body is merely complying with and putting into execution a State or local legislative mandate in adopting an ordinance, in effect exercising a ministerial function, its enactment is administrative and not subject to referendum.
>
> [*Id.* at 414, 908 *A.*2d 846 (quoting *Menendez, supra,* 211 *N.J.Super.* at 172, 511 *A.*2d 676).]

With those principles and the parallel facts of *Menendez* in mind, the panel reasoned that *N.J.S.A.* 40A:14–118 authorized the Trenton City Council to enact an ordinance "creating a table of organization for the police department," but did not mandate the number of officers to fill each rank within the police department. *Id.* at 416–17, 908 *A.*2d 846. Because the City Council exercised discretion in establishing ranks and the number of officers to serve in each rank, the ordinance was deemed legislative in nature and subject to referendum. *Id.* at 416–18, 908 *A.*2d 846.

Last, the panel rejected the Committee of Petitioners' contention that Ordinance 04–75 was facially invalid because it excessively delegated administrative authority by setting a minimum and

456

maximum range of officers to fill each rank, rather than fixing the exact number of officers for each rank. *Id.* at 419, 908 *A.2d* 846.

We granted the City's petition for certification challenging the Appellate Division's order scheduling a referendum for Ordinance 04–75 and denied the Committee of Petitioners' cross-petition contesting the facial validity of the ordinance. 189 *N.J.* 646, 917 *A.2d* 786 (2007).[3]

## II.

The City and the Committee of Petitioners agree that the outcome of their referendum dispute hinges on whether Ordinance 04–75 is classified as either an administrative or legislative ordinance. The City argues that Ordinance 04–75 is administrative in nature and therefore the referendum petition is invalid.[4] The Committee contends that the ordinance is of the legislative kind and must be placed on the ballot for voter approval.

Based primarily on *Cuprowski* and its progeny, the City gives five reasons in support of designating the ordinance as administrative. The City submits that Ordinance 04–75's restructuring of

---

[3] On September 7, 2006, the City Council adopted Ordinance 06–66, amending in part Ordinance 04–75. Ordinance 06–66(b), in relevant part, provides:

2–56 Establishment of Department and Police Director; number and types of positions; Police Director stipend; Chief of Administrative Services.
B. Number and types of positions
(1) Within the Department of Police, in addition to the Police Director and the Chief of Administrative Services, there shall be the following ranks and number of positions per rank: (1) Captains—6 to 9, (2) Lieutenants—18 to 23, (3) Sergeants—47 to 52 and (4) Police Officers—270 to 290. The Department may also include such civilian employees as may, from time to time, be approved by the Director.

The parties have not argued what impact the adoption of Ordinance 06–66 has on the case before us. We express no opinion on the subject.

[4] The City does not argue here that the salary range increase for the chief of administrative services is not subject to referendum pursuant to *N.J.S.A.* 40A:9–165. For that reason, all further reference to Ordinance 04–75 pertains to those provisions that the trial court concluded were not subject to referendum pursuant to *N.J.S.A.* 40:69A–185.

the police department (1) is neither "permanent" nor "general" in nature, but rather a "temporary" expedient, an administrative change of the "fluctuating sort"; (2) simply puts into execution previously enacted laws—*N.J.S.A.* 40A:14–118 and a prior Trenton ordinance; (3) involves matters so complex and technical that they are beyond the public's competence; (4) concerns matters requiring prompt and efficient executive action, without the need for popular approval, which might undermine the successful administration of the municipality's affairs; and (5) is the outgrowth of "a comprehensive statutory scheme" governing the manner in which a municipality operates a police force and therefore cannot be frustrated by requiring voter ratification. The City maintains that if its ordinance is subject to referendum, a municipality's ability to restructure a police department will be "significantly" restricted. Last, the City asserts that the Appellate Division's "nebulous default standard" "focused solely on the policy interest of public participation" and did not properly weigh a municipality's interest "in governing free from undue harassment."

The Committee of Petitioners counters that, in passing Ordinance 04–75, the City Council engaged in "the exercise of a fully discretionary legislative power delegated to it by [*N.J.S.A.* 40A:14–118]" and therefore the ordinance is subject to referendum. The Committee points out that *N.J.S.A.* 40A:14–118 does not mandate, but makes permissive, the creation of a police department and does not dictate the form of the department's organizational chart or the number of police officers to serve in its ranks.[5] The Committee claims that Ordinance 04–75, which adds

---

[5] *N.J.S.A.* 40A:14–118, in relevant part, provides:

The governing body of any municipality, by ordinance, *may* create and establish, as an executive and enforcement function of municipal government, a police force.... Any such ordinance shall, in a manner consistent with the form of government adopted by the municipality and with general law, provide for a line of authority relating to the police function and for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members. The ordinance *may* provide for the appointment of a chief of police and such

a substantial number of officer positions and eliminates the position of deputy chief, is not materially different from the challenged ordinance in *Menendez,* which increased the number of fire captains in the Union City Fire Department and was subject to referendum.[6]

Additionally, the Committee suggests that the *D'Ercole* decision, which determined that an ordinance authorizing the lease of a firehouse was not subject to referendum, was implicitly overruled by *Tumpson v. Farina,* 120 *N.J.* 55, 57–59, 575 *A.*2d 1368 (1990) (per curiam), which affirmed the validity of a referendum petition contesting an ordinance that approved a long-term lease in a major redevelopment project. The Committee also charges that the City has taken conflicting positions, having in 1999 itself initiated a referendum to decide whether the police department's organizational structure should be altered by removing the position of chief of police and replacing it with a civilian police director, and here deriding the right of the public to participate in a referendum on an equally important policy decision. Finally, the Committee chides the City's "plea for protection" from its "hardworking, civic minded citizens" who, exercising "fundamental grass-roots democracy," circulated petitions and amassed the statutorily required number of signatures to justify a referendum.

We next turn to the purpose of the Faulkner Act's referendum statute, its text and legislative history, its place in a larger statutory scheme, and how those features are incompatible with the case law developed in the wake of the decision in *Cuprowski.*

---

members, officers and personnel as shall be deemed necessary, the determination of their terms of office, the fixing of their compensation and the prescription of their powers, functions and duties, all as the governing body shall deem necessary for the effective government of the force.
[(Emphasis added).]

[6] We note that *Menendez, supra,* involved the application of *N.J.S.A.* 40:74–5, the referendum statute that governs Walsh Act municipalities. 211 *N.J.Super.* at 171, 511 *A.*2d 676. The original referendum statute in the Walsh Act dates back to 1911. *L.* 1911, *c.* 221, § 17. The language of *N.J.S.A.* 40:69A–185 and *N.J.S.A.* 40:74–5 is essentially the same.

## III.

### A.

By enacting *N.J.S.A.* 40:69A–185, the Legislature provided the voters of Faulkner Act municipalities the right to subject an ordinance passed by a city or town council to a popular plebiscite.[7] The "power of referendum" is a check on the exercise of local legislative power, fostering citizen involvement in the political affairs of the community. We have suggested that the referendum statute in the Faulkner Act should be liberally construed and applied that principle to a referendum provision in the Home Rule Act to promote the "beneficial effects" of voter participation. *Retz v. Mayor & Council of Saddle Brook,* 69 *N.J.* 563, 571, 355 *A.*2d 189 (1976).

In this case, within twenty days of passage of the ordinance, the Committee of Petitioners filed a referendum petition with the names and signatures of more than 1600 voters, a number greater than the fifteen percent of the total votes cast in the last election of members of the General Assembly. On that basis, the referendum petition met the statutory qualification for suspending the ordinance from taking effect and requiring that the ordinance be placed on the ballot for voter approval. *See N.J.S.A.* 40:69A–185.[8] The City claims, however, that the statute does not permit a referendum challenge to the type of ordinance enacted in this case.

---

[7] The New Jersey Constitution does not contain a referendum clause permitting voters to directly challenge state or municipal legislative enactments.

[8] *N.J.S.A.* 40:69A–185, in part, states:

> If within twenty days after such final passage and approval of such ordinance a petition protesting against the passage of such ordinance shall be filed with the municipal clerk and if the petition shall be signed by a number of legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected, the ordinance shall be suspended from taking effect until proceedings are had as herein provided.

■ The heart of this case involves the interpretation of *N.J.S.A.* 40:69A–185. Because the statutory language ordinarily is the best indicator of the Legislature's intent, *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005), we must look to the wording of the referendum statute.

### B.

*N.J.S.A.* 40:69A–185, in pertinent part, provides:

The voters *shall also have the power of referendum* which is the power to approve or reject at the polls any ordinance submitted by the council to the voters or *any ordinance* passed by the council, against which a referendum petition has been filed as herein provided. No ordinance passed by the municipal council, except when otherwise required by general law or permitted by the provisions of [*N.J.S.A.* 40:69A–181], shall take effect before twenty days from the time of its final passage and its approval by the mayor where such approval is required.

[(Emphasis added).]

■ The words, "*any* ordinance passed by the council," standing alone, do not suggest that the Legislature intended a particular category of ordinance to be exempted from the referendum requirement. *Ibid.* (emphasis added). The Legislature could have qualified the referendum right by stating that only "some ordinances" or "legislative ordinances" are subject to voter approval. But it did not. Instead, it enacted a statute stating that "the power of referendum" applies to "any ordinance." [9]

---

[9] *N.J.S.A.* 40:49–1 defines an ordinance as "any act or regulation of the governing body of any municipality required to be reduced to writing and read at more than one meeting thereof and published." A municipal enactment must be in the form of an ordinance when required by statute, *Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412, 420, 371 *A.*2d 34 (1977), or the municipal charter, *Public Serv. Ry. Co. v. City of Camden,* 95 *N.J.L.* 190, 112 *A.* 421 (E. & A.1920), or when the enactment has widespread applicability and generally touches on public health, safety, or welfare, or on the organization of the municipal government, *see N.J.S.A.* 40:48–1; *Inganamort, supra,* 72 *N.J.* at 418, 371 *A.*2d 34.

In contrast, *N.J.S.A.* 40:49–1 defines a resolution as "any act or regulation of the governing body of any municipality required to be reduced to writing, but which may be finally passed at the meeting at which it is introduced." A municipal determination may be in the form of a resolution when the determina-

██ We must "ascribe to the statutory words their ordinary meaning and significance." *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. Here, based on its statutory context, the word "any" clearly is synonymous with the word "all." *Webster's Unabridged Dictionary of the English Language* 96 (2001) (noting that "any" is generally understood to be synonymous with "all"); *Black's Law Dictionary* 86 (5th ed. 1979) (giving various definitions of "any" including, "one out of many," "an indefinite number," and "some," but recognizing that "any" is "often synonymous with 'either,' 'every,' or 'all'" and that "[i]ts generality may be restricted by the context"). *See, e.g., Downey v. Bd. of Educ. of Jersey City,* 74 *N.J.Super.* 548, 552, 181 *A.*2d 795 (App.Div.1962) (finding "no ambiguity in the words 'any office, employment or position'" within *N.J.S.A.* 40:69A–208(a) of Faulkner Act, as "[t]hey are words commonly used, easily understood and plainly all-inclusive"). By that definition, the term "any ordinance" does not lend itself to subdividing ordinances into various classes, such as administrative and legislative.

 Because we find no ambiguity in the statutory language, our role in construing the statute could come to an end. Our duty is only to "apply the statute as enacted," not to rewrite it "or presume that the Legislature intended something other than that expressed by way of the plain language." *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 (citation and internal quotation marks omitted). It is not our function to "write in an additional qualification which the Legislature pointedly omitted" from the statute, or "engage in conjecture or surmise which will circumvent [its] plain meaning." *Ibid.* (citations and internal quotation marks omitted).

Despite the apparent clarity of our plain-language interpretation of the statute, a body of case law has developed interpreting "any

---

tion has a "temporary purpose," *Inganamort, supra,* 72 *N.J.* at 418, 371 *A.*2d 34 (quoting McQuillin, *Municipal Corporations,* § 14.02 (3d ed. 1973)), when it is merely "an expression of opinion or mind" or of no binding legal effect, *ibid.,* or when it is not "applicable widely throughout" the municipality, Antieau, *Local Government Law* § 25.10 (2d ed.).

ordinance" to mean that only "legislative," and not "administrative," ordinances are subject to referendum under *N.J.S.A.* 40:69A–185. We now turn to those cases.

## C.

The first court to judicially distinguish between administrative and legislative ordinances was the Law Division in *Cuprowski.* That case involved a referendum petition filed by Jersey City residents challenging a local budget adopted by resolution. *Cuprowski, supra,* 101 *N.J.Super.* at 18, 242 *A.*2d 873. The protesting residents contended that the city budget should have been passed by ordinance and that it was subject to referendum pursuant to *N.J.S.A.* 40:69A–185. *Ibid.* The City countered that *N.J.S.A.* 40A:4–4 authorized it to adopt a budget by resolution. *Id.* at 19, 242 *A.*2d 873.[10] Regardless of whether the budget was passed by ordinance or resolution, the Law Division concluded that the Legislature did not intend for budgets in Faulkner Act municipalities to be subject to referendum. *Id.* at 21, 242 *A.*2d 873. The Law Division reached that conclusion because local budget ordinances take effect immediately, unlike other ordinances, which are held in abeyance for twenty days. *Ibid.* (relying on *N.J.S.A.* 40:69A–181(b) and *N.J.S.A.* 40:69A–185). If a referendum petition is properly filed with the city clerk during that twenty-day waiting period, an ordinance other than a budget ordinance is suspended until a referendum vote. *Ibid.* From that premise, the Law Division maintained that it "must be assumed that the Legislature excluded the budget from recall because it becomes effective immediately upon adoption." *Ibid.*

Having decided on that basis that local budgets are not subject to referendum, the court could have stopped there. Nonetheless, without analyzing the text of *N.J.S.A.* 40:69A–185, its legislative history, or the overall legislative scheme of which it is a part, the

---

[10] *N.J.S.A.* 40A:4–4 provides that "[a]ll budgets shall be introduced, approved, amended and adopted by resolution...."

Law Division theorized, based solely on out-of-state case law, a respected treatise on municipal government, and a law review article, that the Legislature only intended to subject legislative ordinances, and not administrative ordinances, to a referendum. *Id.* at 22–25, 242 *A.2d* 873.

The court in *Cuprowski* distinguished between the two by stating that legislative ordinances speak to issues of a "permanent or general character" while administrative ordinances speak to issues that are "temporary in operation and effect." *Id.* at 23, 242 *A.2d* 873. It further defined administrative acts as "those which result from governmental powers properly assigned to the executive department and necessary to carry out legislative policies and purposes already declared either by the legislative municipal body, or devolved upon it by the law of the state." *Ibid.*

The Law Division then articulated public policy reasons for restricting the right of referendum. *Id.* at 24–25, 242 *A.2d* 873. It noted that *"courts ... must balance two interests—the protection of city government from harassment as against the benefits of direct legislation by the people." Id.* at 25, 242 *A.2d* 873 (emphasis added). The court also expressed concern that "[t]o give a small group of the electorate the right to demand a vote of the people upon every administrative act of the governing body would place municipal governments in a straightjacket and make it impossible for the city's officers to carry out the public's business." *Ibid.* The court concluded that "[t]he consensus of judicial opinions throughout the land is that the preparation, approval and adoption of a municipal budget is administrative in character." *Id.* at 27, 242 *A.2d* 873.

Following *Cuprowski*, the legislative/administrative distinction took hold, and courts began expanding the use of that template to judge whether an ordinance was legislative or administrative in nature for referendum purposes. *See, e.g., D'Ercole, supra,* 198 *N.J.Super.* at 534, 544, 487 *A.2d* 1266 (using distinction to assess whether ordinance providing for long-term lease of firehouse was subject to referendum); *Menendez, supra,* 211 *N.J.Super.* at 171–

72, 511 A.2d 676 (relying on legislative/administrative distinction to decide whether "ordinance increasing the number of fire captains" was subject to referendum); *Twp. of N. Bergen v. City of Jersey City,* 232 *N.J.Super.* 219, 225–26, 556 A.2d 1255 (App.Div.) (applying legislative/administrative distinction to determine whether right to referendum applies to tax abatement resolution), *certif. denied,* 117 *N.J.* 632, 569 A.2d 1334 (1989); *Lawrence v. Schrof,* 162 *N.J.Super.* 375, 380–83, 392 A.2d 1243 (Law Div.1978) (applying distinction to determine whether bond ordinance should be subjected to referendum); *Millennium Towers Urban Renewal LLC v. Mun. Council of Jersey City,* 343 *N.J.Super.* 367, 372, 374, 778 A.2d 598 (Law Div.2001) (utilizing distinction to analyze whether tax abatement ordinance should be subjected to referendum); *see also Tumpson, supra,* 120 *N.J.* at 56–58, 575 A.2d 1368 (working implicitly within legislative/administrative framework). *But see In re Certain Petitions for a Binding Referendum,* 154 *N.J.Super.* 482, 485–87, 381 A.2d 1217 (App.Div.1977) (finding that Legislature must have intended that traffic ordinances would not be subject to referendum because of statewide need for comprehensive traffic planning, and thus not utilizing legislative/administrative dichotomy).

Because of this body of prior decisional law, we will supplement our plain-language interpretation of the statute with a review of extrinsic sources that may reveal the Legislature's intent in extending the power of referendum to "any ordinance." Therefore, we next examine the legislative history of the referendum statute.

D.

A review of that history nowhere suggests that the Legislature considered restricting the reach of the referendum statute to ordinances characterized as only legislative in nature. Significantly, an earlier rejected version of the referendum bill in the Faulkner Act proposed carving out an exception to the voters'

right to seek ballot approval of municipal ordinances. Assemb. B. 300, 173d Leg. (N.J. 1949). That earlier bill read:

> If within twenty days after the final passage of an ordinance, *except ordinances authorizing an improvement or the incurring of an indebtedness, other than for current expenses,* where other requirements are made by law, a petition signed by electors of the municipality equal in number to at least ten per cent of the registered voters protesting against the passage of such ordinance, be presented to the governing body, it shall thereupon be suspended from going into operation and the governing body may reconsider the ordinance.
>
> [*Ibid.* (emphasis added).]

The final bill that became law eliminated the exception for "ordinances authorizing an improvement or the incurring of indebtedness" and increased to fifteen percent the number of protesting voters necessary to trigger a referendum. *See N.J.S.A.* 40:69A–185. The Legislature obviously considered and rejected writing in the qualification to the right of referendum contained in the earlier bill. We can infer that the Legislature was mindful not only of the breadth of the statute, but also of how to expand or contract voter participation.

Indeed, the text of *N.J.S.A.* 40:69A–185 contains at least a partial, if not total, exception to the referendum rule for municipal budgets. *N.J.S.A.* 40:69A–185 provides that no ordinance shall take effect before twenty days of the time of its final approval, "except when otherwise required by general law or permitted by the provisions of [*N.J.S.A.* 40:69A–181.]" The twenty-day grace period allows protesting citizens the time to file the requisite number of signatures necessary to suspend implementation of the ordinance until a referendum vote. *N.J.S.A.* 40:69A–185. The Legislature, however, exempted local budget ordinances from this twenty-day waiting period,[11] signifying that, unlike other ordinances, a budget ordinance cannot be suspended. Interestingly, on that basis, the *Cuprowski* court concluded that "[i]t therefore must be assumed that the Legislature excluded the budget from

---

[11] *N.J.S.A.* 40:69A–181(b) states that "[n]o ordinance other than the local budget ordinance shall take effect less than twenty days after its final passage by council and approval by the mayor where such approval is required...."

recall because it becomes effective immediately upon adoption." 101 *N.J.Super.* at 21, 242 *A.*2d 873.

The point of this discussion is that the Legislature knew precisely how to exclude particular ordinances from the purview of the referendum statute when it wished to do so. Buttressing this point is the fact that throughout the *New Jersey Statutes Annotated* the Legislature has exempted particular ordinances from a referendum challenge.

For example, the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-1 to -129, provides that "[n]o zoning ordinance and no amendment or revision to any zoning ordinance shall be submitted to or adopted by initiative or referendum." *N.J.S.A.* 40:55D-62(b); *see also Tumpson v. Farina,* 240 *N.J.Super.* 346, 351, 573 *A.*2d 472 (App.Div.) (recognizing *N.J.S.A.* 40:55D-62 as statutory exception to referendum statute), *aff'd,* 120 *N.J.* 55, 575 *A.*2d 1368 (1990). The MLUL was enacted after passage of the Faulkner Act, demonstrating that the Legislature knew how to carve out exceptions to the referendum statute. Ordinances exempted from referendum are found in many other statutes. *See, e.g., N.J.S.A.* 27:19-26.5 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to commission); *N.J.S.A.* 40:14B-48 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to municipal authority for purpose of maintaining or operating utility system, including water distribution or sewage facilities); *N.J.S.A.* 40:66A-52 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to solid waste management authority); *N.J.S.A.* 40:68A-19 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to port authority); *N.J.S.A.* 40:68A-56 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to municipal port authority); *N.J.S.A.* 40A:2-18 (exempting from referendum certain bond ordi-

nances); *N.J.S.A.* 40A:4–3.2 (exempting from referendum municipal ordinance adopting State fiscal year).

That sampling clearly establishes that the Legislature has determined, on multiple occasions, those municipal matters that should not be called before the voters in a referendum. Because the Legislature has made exceptions to *N.J.S.A.* 40:69A–185 with such precision in a multitude of statutes, we cannot find that it intended an amorphous legislative/administrative distinction that cannot be gleaned from the statute's text, legislative history, or place in the larger statutory scheme.

### E.

The court in *Cuprowski, supra,* expressed concern that "a small group of the electorate" demanding a vote on "every administrative act of the governing body" might constitute harassment and "make it impossible for the city's officers to carry out the public's business." [12] 101 *N.J.Super.* at 25, 242 *A.*2d 873. It therefore spoke of the need for courts to weigh "the benefits of direct legislation by the people." *Ibid.* There is a difference, however, between the Legislature, as a matter of public policy, modulating the degree of voter participation permissible in municipal affairs by exempting particular ordinances from referendum, and a court judicially carving out a wide swath of ordinances, designated as "administrative," from the general rule that "any ordinance" is subject to referendum.

It is the function of the Legislature, not the courts, to determine how much direct democracy through referendum should be conferred on the voters of a municipality. Our role is to

---

[12] We find it difficult to describe fifteen percent or more of those who cast votes in the last General Assembly election—in this case 1600 citizens of Trenton—as a "small" disgruntled group of the electorate. The Legislature has gauged the proper number of protesting voters to trigger a referendum, and here that number was achieved.

construe the statute, not to impose our policy preferences, particularly when to do so inhibits voter participation.

From the point of view of those with a vested interest in insulating an ordinance from voter review, a referendum challenging any ordinance might be seen as harassing and the democratic process as inconvenient or inefficient. But the Legislature determined that the referendum right—the right to participatory democracy—is of inestimable value in these circumstances as a check on local governing bodies. We are required to vindicate that value judgment made by the Legislature, which is the proper body to decide whether exceptions should be made to *N.J.S.A.* 40:69A–185.

## F.

It also bears mentioning that the legislative/administrative distinction has spawned conflicting approaches among appellate panels, *see, e.g., Menendez, supra,* 211 *N.J.Super.* at 172–73, 511 *A.*2d 676; *D'Ercole, supra,* 198 *N.J.Super.* at 544–46, 487 *A.*2d 1266, and proven difficult to apply, *Tumpson, supra,* 120 *N.J.* at 56–58, 575 *A.*2d 1368. Although this is the first time we directly address the legitimacy of the legislative/administrative distinction, in our brief per curiam opinion in *Tumpson,* we worked uneasily within its general framework. *See ibid.* In that case, the City of Hoboken passed an "ordinance authorizing execution of a municipal development agreement and lease between [it] and the Port Authority of New York and New Jersey." *Id.* at 56, 575 *A.*2d 1368. In upholding the right of the local citizen's group to subject the ordinance to referendum, we declined an "unduly-rigid interpretation of the Faulkner Act" along legislative/administrative lines, noting that despite the "administrative or executive" features of the ordinance, the "broad legislative question" at issue was fit for the referendum process because it would "forever change the nature of the community." *Id.* at 58, 575 *A.*2d 1368. In that case, we did not have occasion, as we have done here, to consider the text or legislative history of *N.J.S.A.* 40:69A–185, or the larger statutory referendum scheme.

Additionally, some courts, such as the *Menendez* court and the Appellate Division in this case, have given the *Cuprowksi* test a limited reading. In an effort to constrain the breadth of the dicta in *Cuprowski*, the court in *Menendez* greatly narrowed the definition of the "administrative" ordinance exception by stating: "When a municipal governing body is merely complying with and putting into execution a State or local legislative mandate in adopting an ordinance, in effect exercising a ministerial function, its enactment is administrative and not subject to referendum." 211 *N.J.Super.* at 172, 511 *A.2d* 676; *see also In re Referendum Petition, supra,* 388 *N.J.Super.* at 414–15, 908 *A.2d* 846 (applying *Menendez*).

In many respects, our analytical approach is in step with the *Menendez* court and the Appellate Division in this case. To the extent that *Menendez* was merely saying that a municipal referendum cannot be the vehicle to override a state mandate embodied in a legislative enactment, we agree. A statute has supremacy over an ordinance. *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 601, 350 *A.2d* 19 (1975) (noting that it "is well established that when a state statute has preempted a field by supplying a complete system of law on a subject, an ordinance dealing with the same subject is void"); *Summer v. Twp. of Teaneck,* 53 *N.J.* 548, 554, 251 *A.2d* 761 (1969) ("A municipality may not contradict a policy the Legislature establishes.... This follows from the basic principle that local government may not act contrary to State law." (citations omitted)). If a statute, for instance, *required* a municipality to have a police department with a chief of police as its head, an ordinance carrying out that mandate would not be subject to referendum because the voters of a municipality cannot repeal a legislative enactment. A state mandate that does not allow for the exercise of municipal discretion cannot be overridden by a referendum. With that caveat, our interpretative approach is consonant with *Menendez* and the appellate panel here.

## IV.

Today, we recognize that *N.J.S.A.* 40:69A–185 is part of a comprehensive legislative scheme that spells out the general right of referendum in Faulkner Act municipalities and the specific exceptions to that right. The Legislature has occupied the field in this area, and there is no place for a separate judicial policy exempting municipal ordinances from referendum.

The Legislature conveyed to the voters of Trenton "the power of referendum"—"the power to approve or reject at the polls" Ordinance 04–75. *N.J.S.A.* 40:69A–185. If the Legislature did not intend the voters of Faulkner Act municipalities to have this degree of democratic involvement in governmental affairs, then it must say so. We will not, however, write judicial qualifications into the referendum statute that limit voters' right to participatory government.[13]

We therefore conclude that Trenton Ordinance 04–75 is subject to voter approval in a referendum. We affirm and modify the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.

Justices LONG, LaVECCHIA, WALLACE, and RIVERA-SOTO join in Justice ALBIN's opinion. Justice HOENS did not participate.

*For affirmance/modification/remandment*—Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA-SOTO—5.

*Opposed*—None.

---

[13] The primary reason for requiring that certain municipal enactments take the form of an ordinance is to promote "public notice and participation." *Ingana-mort, supra,* 72 *N.J.* at 420, 371 *A.*2d 34. Prior public notice is mandated for ordinances, but not for resolutions. *N.J.S.A.* 40:49–1. Nevertheless, a municipality is not prohibited from providing increased public notice for resolutions. A municipality is free to follow the same procedures in adopting a resolution as those used in enacting an ordinance. Heightened notice, alone, does not convert what is denominated a resolution into an ordinance.