NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5731-11T4

HONORABLE DANA L. REDD, Camden
City Mayor, and HONORABLE
FRANCISCO MORAN, Camden City
Council President,

     Plaintiffs-Respondents,

v.

VANCE BOWMAN, LARRY GILLIAMS,
EULISIS DELGADO, MARY I. CORTES,
and ROBERT DAVIS, individually
and collectively as the Committee
of Petitioners,

     Defendants-Appellants,

and

LUIS PASTORIZA, Clerk of the City of
Camden, JOSEPH RIPA, Clerk of Camden
County; PHYLLIS PEARL, Camden County
Superintendent of Elections; and the
CAMDEN COUNTY BOARD OF ELECTIONS,

     Defendants-Respondents,

and

CAMDEN CITY COUNCIL,

     Defendant.

       **APPROVED FOR PUBLICATION**

       **October 29, 2013**

       **APPELLATE DIVISION**

_____

Argued June 4, 2013 — Decided October 29, 2013

Before Judges Messano, Lihotz and Ostrer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2019-12.

Anthony Valenti argued the cause for appellants (Caplan, Valenti & Murray, PC, attorneys; Mr. Valenti and Karen M. Murray, on the brief).

John C. Eastlack, Jr. argued the cause for respondent Honorable Dana L. Redd, Camden City Mayor (Weir & Partners, L.L.P., attorneys; Mr. Eastlack, on the brief).

Jay J. Blumberg argued the cause for respondent Honorable Francisco Moran, Camden City Council President (Law Offices of Jay J. Blumberg, attorneys; Mr. Blumberg, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

The government of the City of Camden (Camden) operates pursuant to the Optional Municipal Charter Law, N.J.S.A. 40:69A-1 to -210, commonly known as the Faulkner Act (or the Act). The voters in a Faulkner Act municipality "may propose any ordinance and may adopt or reject the same at the polls, such power being known as the initiative . . . ." N.J.S.A. 40:69A-184. They "also have the power of referendum[,] which is the power to approve or reject at the polls any ordinance submitted by the council to the voters or any ordinance passed by the council, against which a referendum petition has been filed . . . ." N.J.S.A. 40:69A-185.

We have said that "[t]he 'salutary purposes' of both initiative and referendum include 'arousing public interest' and 'placing in the hands of the voters . . . direct means of controlling proposed or already enacted municipal legislation and also of accomplishing the enactment of legislation which has neither been proposed nor adopted.'" City of Ocean City v. Somerville, 403 N.J. Super. 345, 352 (App. Div. 2008) (quoting Maese v. Snowden, 148 N.J. Super. 7, 11 (App. Div. 1977) (citations omitted)). The "[t]wo statutes ensure that the voters have that right both before and after the council adopts an ordinance on any particular subject." Ibid. (citations omitted).

This appeal involves an initiative petition and proposed ordinance filed with the Camden city clerk, defendant Luis Pastoriza, by defendants Vance Bowman, Larry Gilliams, Eulisis Delgado, Mary I. Cortes and Robert Davis, collectively known as the Committee of Petitioners (the Committee). The ordinance was proposed in response to Camden's decision to disband its municipal police department and join a newly-formed county police force. Plaintiffs, Mayor Dana L. Redd and City Council president Francisco Moran, filed a complaint seeking to declare the petition-initiated ordinance invalid before it was submitted to the City Council or placed on any ballot.

The Law Division judge determined that the proposed ordinance did not "unduly restrict" Camden's "statutory authority" under N.J.S.A. 40A:14-118, which grants every municipality the right to "create and establish" a police force. However, the judge entered restraints "prohibiting" the city clerk "from accepting the petition and proposed ordinance for filing" because the proposed ordinance "create[d] an undue restraint on the future exercise of municipal legislative power," was "invalid," and could not "be placed on the ballot for voters to act upon." The judge specifically refrained from considering whether the proposed ordinance was pre-empted by the Municipal Rehabilitation and Economic Recovery Act, N.J.S.A. 52:27BBB-1 to -75 (MRERA), and the Special Municipal Aid Act, N.J.S.A. 52:27D-118.24 to -118.31 (SMAA). The Committee filed this appeal.

We have considered the arguments raised in light of the record and applicable legal standards. We reverse and remand for further proceedings consistent with this opinion.

I

The facts are not disputed. Camden's existing municipal police department was established and organized by ordinance as authorized by N.J.S.A. 40A:14-118. On June 17, 2008, Camden entered into a Memorandum of Understanding (MOU) with the

Division of Local Government Services (DLGS) in the Department of Community Affairs (DCA) for the provision of $61.5 million in aid pursuant to the SMAA. The MOU required Camden to accept certain oversight measures and other conditions imposed by the State. Camden entered into similar MOUs in order to receive additional aid in 2009 and 2010.

Nevertheless, Camden's financial woes continued. On June 23, 2010, DLGS published qualification standards for the "Transitional Aid to Localities" program (TAL), which superseded prior programs, including the SMAA. As declared by DLGS, TAL was intended for "municipalities that have the most severe structural financial problems," "despite aggressive cost reductions and service modifications," and need additional assistance "to mitigate significant property tax increases." The standards emphasized "labor cost reductions and changes in service delivery" as "preconditions for receipt of aid." Such reductions and changes would require the elimination of "redundant or excessive services." A municipality's application for TAL funding needed to demonstrate cost reductions compared to its 2009 budget, including "documented efforts to share public safety dispatch, code enforcement, public health services, and other services offered by neighboring municipalities, area boards of education, local authorities, or

the county, if those costs are less than the current full cost of providing equivalent service."

Camden sought $54 million in TAL funding for 2011. The application painted a dire picture of increasing costs and projected budget shortfalls, as well as the anticipated adverse impact that reductions in Camden's police force would have upon the acknowledged historic, and intractable, violent crime rate in the city. Camden agreed to enter into an MOU by which DLGS would have outside "management, financial, and operational specialists" assess municipal operations, and the city would "[i]mplement actions as recommended . . . ." On November 24, 2010, DLGS awarded Camden $69 million in TAL funding for 2011, and, on December 15, Camden and DLGS entered into a new MOU for 2011. The MOU required Camden to reduce staffing further for 2012, and make other efforts to reduce costs, maximize recurring revenue, and eliminate the need for TAL funding within four years. Camden continued to negotiate collective bargaining agreements with those unions representing its police department, which had experienced a significant reduction in force. Camden came under some degree of DLGS oversight and control, although it is unclear from the record its nature and extent.

In a February 15, 2011 notice, DCA clarified that the receipt of TAL funding required a municipality to show it "ha[d]

moved beyond planning for operational efficiency and ha[d] begun to reduce costs." DCA "expect[ed] that the municipality . . . [had] engaged with its unions and non-union employees to effectuate savings through reduced salary costs, reduced staffing levels, modified work rules, modified controllable benefits costs, or other efforts to mitigate" salary and wage costs. Participation would require the municipality to "[s]ubmit[] to broad State controls over hiring, procurement, and other matters[,]" and "additional fiscal control measures as may be directed by [DLGS]."

In June 2011, Camden issued "Camden Forward, the Transition Plan for 2011-2015." While recognizing the intended use of non-TAL funding to rehire laid-off police officers as a short-term measure, the plan noted Camden's intention to explore "regionalized or shared services for police and fire services as a long-term solution for public safety and the fiscal challenges confronting the City."

On August 9, 2011, the City Council passed a resolution authorizing Camden to enter into an MOU with DCA and the County of Camden (the County) "for the purpose of preparing a plan for the creation of the Camden County Police Department," a new countywide agency. On August 29, 2011, the MOU was executed by plaintiffs, County officials and the Director of DLGS. Under

the terms of the MOU, Camden agreed to "act as a co-applicant on submittals and filings . . . with respect to the creation of the Camden County Police Department." The County would act as the "lead agency" in forming the County police department which would be "available to all municipalities within the County on a voluntary basis."

On the same day, Camden requested $67.5 million in TAL funding for 2012. The application represented that the 2012 budget anticipated an agreement with the County "under which [Camden] would pay $14,000,000 for police services." On October 7, DLGS advised Camden that it would receive $61.4 million in TAL funding for 2012.

On December 27, 2011, the City Council adopted a resolution immediately implementing the MOU regarding formation of a County police department. The resolution noted that the County police department would include a Camden Metro Division "to provide for public safety and law enforcement in . . . Camden," while "requiring the County Police Department to offer employment to qualified officers previously employed" by the Camden police department. Camden's police department would be dissolved upon the creation of the Camden Metro Division. On January 26, 2012, the County adopted a resolution establishing the county police department.

On April 10, 2012, the Committee submitted a petition seeking consideration of an initiative ordinance amending Camden's municipal code to read:

> A.   There shall be created and maintained in continued existence, in, for and by the city of Camden, its own Police Department which shall remain the police department for the City of Camden and which shall consist of a Police Director, a Chief of Police and members and officers as shall be deemed necessary by the governing body of the City of Camden which shall, from time to time, determine the number of persons, including, without limitation, temporary officers and members in an emergency, to be appointed to these positions, together with their compensation, all as provided for under N.J.S.A. 40A:14-118.
>
> B.   The City of Camden shall not disband its Police Department pursuant to the creation of any county wide Police Department established by or for the County of Camden and shall not participate or join in the creation of any such police department established by or for the County of Camden, nor participate in any consolidation of or regionalization of police services sought to be created by any establishment of a county wide police department, and shall instead continue to maintain its own police department.

Pastoriza reviewed the petition, and, on April 20, concluded it was legally sufficient.  See N.J.S.A. 40:69A-187 (requiring all initiative and referendum petitions to be filed with the municipal clerk who "shall determine whether . . . the petition has a proper statement of the circulator and . . . is signed by

a sufficient number of qualified voters"). Pastoriza advised the Committee, plaintiffs and other interested parties that he would "move the certified petition forward as an ordinance on [second] reading and public hearing [at] the next regularly scheduled City Council meeting (May 8[], 2012) for City Council consideration and action as required by law."[1]

Plaintiffs filed their complaint on May 2, 2012, naming the Committee and its individual members, the City Council, Pastoriza, and various County officials as defendants. Plaintiffs sought a declaration that the "proposed petition-initiated ordinance [was] null and void," and injunctive relief, specifically enjoining Pastoriza from submitting the ordinance to the City Council and the City Council from considering it. The Committee answered and asserted a counterclaim and crossclaim, seeking a declaration that the ordinance was valid, requiring its submission to the City Council and, if rejected, its placement on the ballot for consideration by the voters.

The judge granted plaintiffs temporary restraints, and the parties stipulated to the dismissal of the complaint as to the

---

[1] N.J.S.A. 40:69A-190 provides: "Upon a finding by the municipal clerk that any petition . . . is sufficient, the clerk shall submit the same to the municipal council without delay. An initiative ordinance so submitted shall be deemed to have had first reading and provision shall be made for a public hearing."

City Council with prejudice. Following a hearing on June 11, 2012, the judge placed his oral decision on the record and entered the order under review.

II

The Committee claims that the proposed ordinance was a valid exercise of the initiative powers granted by the Faulkner Act, and the judge erred by concluding the proposed ordinance impermissibly restrained future municipal legislation. The Committee also asserts that the initiative ordinance was not prohibited by N.J.S.A. 40A:14-118, nor preempted by the statutory regimes impacting local finance and budgeting in Camden.[2]

A.

We begin by noting that "a question of statutory interpretation[] . . . is a purely legal issue and, thus, we owe no deference to the trial court's legal conclusions." In re Trenton Ordinance 09-02, 201 N.J. 349, 358 (2010) (citing Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). "'Our task . . . is to determine and effectuate the

_____

[2] The judge concluded the ordinance did not violate N.J.S.A. 40A:14-118. Plaintiffs have not cross-appealed from that determination. We therefore need not consider the Committee's argument in this regard.

Legislature's intent.'" Ibid. (quoting Bosland v. Warnock Dodge Inc., 197 N.J. 543, 553 (2009)).

As noted, N.J.S.A. 40:69A-184 allows the voters in a Faulkner Act municipality to "propose any ordinance and . . . adopt or reject the same at the polls . . . ." (Emphasis added). The Faulkner Act "does not limit the power of initiative to only those areas of municipal concern which have never been the subject of favorable council action." Smith v. Twp. of Livingston, 106 N.J. Super. 444, 450 (Ch. Div.), aff'd o.b., 54 N.J. 525 (1969). Instead, it lets voters seek "to amend a long-standing ordinance" when "there is either a change in the circumstances or in the will of the people." Ibid.

"N.J.S.A. 40:69A-184 . . . by its very terms admits of no qualification." Ocean City, supra, 403 N.J. Super. at 357. Yet, while the express language permitting the proposal by initiative of "'any ordinance' means 'all ordinances,' . . . no one disputes that the power of initiative is not without limitation." Ibid. (citing In Re Ordinance 04-75, 192 N.J. 446, 454, 460-61 (2007)). "[T]here are certain ordinances . . . which are simply not subject to initiative and referendum because of the subject matter involved or because they are statutorily excluded from the initiative and referendum provisions." Id. at 359 (citations omitted).

For example, in In re Ordinance 04-75, supra, 192 N.J. at 465, the Court recognized that the referendum provision of the Faulkner Act "contains at least a partial, if not total, exception to the referendum rule for municipal budgets." The Court also set forth a non-exhaustive list of statutes that exempt ordinances enacted thereunder from the referendum provisions of the Act. Id. at 466-67. "That sampling clearly establishes that the Legislature has determined, on multiple occasions, those municipal matters that should not be called before the voters in a referendum." Id. at 467.

"But even where the legislative directive has not been as express or precise, limitations on initiative authority may be inferred or implied from comprehensive State supervision, regulation or occupation of the field." Ocean City, supra, 403 N.J. Super. at 360. We need not repeat the examples of this proposition we previously cited in Ocean City. Id. at 360-70.

In declaring the initiative ordinance invalid in this case, the Law Division judge did not rely upon either the express language of the Faulkner Act or some other statute, or the "comprehensive State supervision, regulation or occupation of the field." Id. at 360. Indeed, he specifically declined to address whether the SMAA or MRERA preempted the initiative-generated ordinance. Instead, the judge concluded the ordinance

was invalid because it "create[d] an undue restraint on the future exercise of municipal legislative power." We now consider that issue.

B.

In Ocean City, supra, we recognized another limit "on the power of initiative [that] stems from the settled principle that a governing body cannot, absent specific legislative permission, divest its successors of legislative power." Id. at 359 (citing Maese, supra, 148 N.J. Super. at 13 (quoting McCrink v. West Orange, 85 N.J. Super. 86, 91 (App. Div. 1964))); (citing 4 McQuillin on Municipal Corporations § 13.03(b) (3d rev. 1968)) (emphasis added); see also N.J. Educ. Ass'n v. State, 412 N.J. Super. 192, 214-15 (App. Div.), certif. denied, 202 N.J. 347 (2010) ("[A]bsent specific legislative permission, a governing body cannot divest its successors of legislative power."). "It stands to reason . . . that if a governing body cannot by ordinance presently adopted restrain the future exercise of municipal legislative power, neither may the citizenry through initiative or referendum create an ordinance divesting the municipal governing body of that power." Ocean City, supra, 403 N.J. Super. at 359.

In McCrink, supra, 85 N.J. Super. at 88-89, an initiative ordinance sought to fix maximum salary ranges for fire personnel

that could not be raised for two calendar years.  We declared the "ordinance [was], on its face, defective[,]" noting "[i]t is fundamental that a governing body could not, by an ordinance presently adopted, place a restraint upon the future exercise of municipal legislative power."  Id. at 91.

In Maese, supra, an initiative ordinance sought to prohibit the governing body or officials of the township "from committing or spending any public funds," "incurring any indebtedness" or "pledging or obligating public funds" to construct a municipal complex on township land.  148 N.J. Super. at 10.  Relying on McCrink, supra, the trial judge concluded the "ordinance was invalid on its face 'because it acts as a restraint on all future actions, not only by this governing body but by any other governing body.'"  Id. at 11.  We affirmed, holding,

> [t]he invalidity of the proposed initiative ordinance . . . springs from an attempt to shackle, if not to completely immobilize, the governing body in connection with construction on the municipally-owned tract. Since the governing body itself could not enact such an ordinance, it follows from what has been said that the voters were likewise without that authority.
>
> No governing body, certainly without specific legislative permission, may divest its successors of legislative power.
>
> [Id. at 13 (citing 4 McQuillin, supra, §13.03b at 477) (emphasis added).]

As the above discussion demonstrates, this restriction on the legislative power of voters in a Faulker Act municipality arose from a basic tenet of municipal corporate law, not the express language of the Faulkner Act or any other statute. "Although a council has the power, unless restricted by charter, to enact an ordinance to take effect after the expiration of the terms of office of its members, it cannot, by ordinance, divest its successor of legislative power . . . ." McQuillin on Municipal Corporations § 13:03.15 (3d Ed. 2011) (citing Ocean City, supra, and Maese, supra). However, as we recognized in Ocean City and Maese, an exception to the general rule exists when the Legislature specifically permits present legislative bodies to restrict the legislative power of their successors. Ocean City, supra, 403 N.J. Super. at 359; Maese, supra, 148 N.J. Super. at 13.

C.

N.J.S.A. 40:48-1 provides that "[t]he governing body of every municipality may make, amend, repeal and enforce ordinances . . . ." However, the Legislature has bestowed a unique characteristic on an ordinance passed by initiative.[3] The

---

[3] As the subsequent discussion makes clear, we respectfully disagree with our colleagues who stated in Ocean City, supra, 403 N.J. Super. at 357-58, "ordinances passed by initiative are

(continued)

Faulkner Act specifically strips away the power of the governing body to repeal a validly-approved initiative ordinance and bestows that power solely on the voters.

> If a majority of the qualified electors voting on the proposed ordinance shall vote in favor thereof, such ordinance shall thereupon become a valid and binding ordinance of the municipality and be published as in the case of other ordinances. <u>No such ordinance shall be amended or repealed within [three] years immediately following the date of its adoption by the voters, except by a vote of the people. The council may, within [three] years immediately following the date of adoption of the ordinance, submit a proposition for the repeal or amendment of that ordinance to the voters at any succeeding general election or regular municipal election. If the proposition submitted shall receive a majority of the votes cast at that election, the ordinance shall be repealed or amended accordingly.</u>
>
> [<u>N.J.S.A.</u> 40:69A-196(a) (emphasis added).]

This highlighted provision was added to the Faulkner Act in 1982, five years after our decision in <u>Maese</u>. <u>See</u> <u>L.</u> 1982, c. 145, § 6 (eff. Sept. 28, 1982) (the Amendment).

The Amendment also changed the terms of the Commission Form of Government Law, known as the Walsh Act, <u>N.J.S.A.</u> 40:70-1 to 40:76-27, which theretofore had provided, without limitation,

---

(continued)
subject to amendment or repeal in the same manner that ordinances passed by the governing body of a municipality are."

that any ordinance passed by initiative "shall not be repealed or amended except by a vote of the people." N.J.S.A. 40:74-18 (1982). The Amendment added a similar three-year limit during which an initiative ordinance could not be repealed or amended in a Walsh Act municipality unless submitted to, and approved by, the voters. L. 1982, c. 145, §§ 16, 17. The Legislative statement accompanying the Amendment makes clear its purpose: "[T]o establish a uniform [three] year time limit within which a governing body may, solely by submission to the voters, amend or repeal an ordinance adopted by initiative . . . ." Bill Sponsor's Statement to S.763 (1982).

Prior to the Amendment, an ordinance approved by initiative in a Faulkner Act municipality "bec[a]me a valid and binding ordinance of the municipality and [would] be published as in the case of other ordinances." N.J.S.A. 40:69A-169 (1982). Presumably, like any other ordinance, it was subject to immediate repeal by the municipal governing body. Hence, application of a general principle of municipal corporate law to initiative ordinances — a present legislative body may not bind the hands of it successors — was logical. The voters could not restrict the legislative powers of a successor governing body any more than the present governing body could.

However, through passage of the Amendment, the Legislature has given the voters in a Faulkner Act municipality the power to restrict the legislative actions of the present governing body and its successor for a period of three years, which restriction may only be removed if the governing body returns the issue to the people for a vote.  In other words, the Legislature has granted to the people "specific legislative permission," Maese, supra, 148 N.J. Super. at 13, to divest the governing body of its legislative power for a finite period of time, thereby creating an exception to the general rule that "[n]o governing body . . . may divest its successors of legislative power." Ibid.

Given the legislative changes made to the Faulkner Act since Maese and McCrink were decided, those cases have limited vitality.[4]  Lest our opinion be read too broadly, we reiterate that the Faulkner Act's provisions only limit the governing body's right to repeal an initiative ordinance for three years, unless the voters choose otherwise.  Because the issue is not

---

[4] We agree with an argument made by the Committee before the trial judge and on appeal, i.e., that the discussion in Ocean City of this judicially-imposed limit on the power of initiative was dicta.  Our decision in that case turned squarely on the fact that the proposed ordinance impermissibly tread on the municipality's budgetary powers, and, hence, was not a permitted subject matter for initiative.  See Ocean City, supra, 403 N.J. Super. at 363-70.

before us, we need not consider, for example, whether an initiative ordinance that expressly prohibited the governing body from taking action for a period longer than three years, or committed the governing body to a particular action for more than three years, would be permissible.

In this case, the proposed ordinance contained no such restrictions. Paragraph A called for the creation and "continued existence" of the municipal police department, pursuant to N.J.S.A. 40A:14-118. As we noted, Camden had already created a municipal police department by ordinance, and the department's continued existence was implicit unless, and until, the existing police ordinance was repealed or modified. See, e.g., Inganamort v. Ft. Lee, 72 N.J. 412, 421 n.2 (1977) ("[A]n ordinance may be promulgated which continues in force until repealed or superseded.") (citation omitted).

Paragraph B of the initiative ordinance prohibited the city from disbanding the police force and joining any County police force, requiring that Camden "shall instead continue to maintain its own police department." Such general language certainly does not violate the expressed or implied terms of the Faulkner Act. By analogy, in Concerned Citizens of Wildwood Crest v. Pantalone, 185 N.J. Super. 37, 40, 47 (App. Div. 1982), we held a Walsh Act initiative ordinance that, without temporal

limitation, "affirmatively provide[d] that the beaches in Wildwood Crest w[ould] be free," was not an improper restraint on the future exercise of legislative action.

Furthermore, based upon the Court's recent guidance, judicially-constructed limits on the right to initiative and referendum are inappropriate.

> [W]here the legislative intent is not clear "from the statute's text, legislative history, or place in the larger statutory scheme[,]" an intention to immunize an ordinance from a Faulkner Act challenge will not be found. . . . Put another way, in the absence of an unequivocal legislative expression to the contrary, citizens in a Faulkner Act municipality are empowered to protest any ordinance under the Act. The burden is on the party seeking to defeat the Faulkner Act to clearly establish the existence of a contrary legislative intent.
>
> [In re Ordinance 09-02, supra, 201 N.J. at 362 (quoting In re Ordinance 04-75, supra, 192 N.J. at 467).]

"It is the function of the Legislature, not the courts, to determine how much direct democracy through referendum should be conferred on the voters of a municipality." In re Ordinance 04-75, supra, 192 N.J. at 467. "[T]he democratic processes reserved to the people by the Faulkner Act referendum provision cannot be abridged except with express legislative approval." In re Ordinance 09-02, supra, 201 N.J. at 368. "The Legislature has occupied the field in this area, and there is no place for a

separate judicial policy exempting municipal ordinances from referendum." In re Ordinance 04-75, supra, 192 N.J. at 470; see also Roseff v. Byram Twp., 432 N.J. Super. 8, 13 (App. Div. 2013) ("[A] court's role is limited to determining whether the Legislature's intention to exempt an ordinance . . . from referendum is indicated by the authorizing 'statute's text, legislative history or place in the larger statutory scheme.'") (quoting In re Ordinance 04-75, supra, 192 N.J. at 467)).

There is no principled reason to treat the Faulkner Act's initiative process any differently. See Great Atl. & Pac. Tea Co. v. Borough of Point Pleasant, 137 N.J. 136, 146 (1994) (stating initiative and referendum under N.J.S.A. 40:69A-184 and -185 are similar because "[b]oth forms of action result in action that is binding on the governing body"); Twp. of Sparta v. Spillane, 125 N.J. Super. 519, 523, 525 (App. Div. 1973) ("The initiative and referendum processes authorized by the act comprise two useful instruments of plebiscite power . . . ."), certif. denied, 64 N.J. 493 (1974). We therefore reverse those provisions of the Law Division's order that declared the proposed ordinance to be "invalid" and restrained its further consideration by the Council or the voters because it improperly restricted future municipal legislative action.

"A statute has supremacy over an ordinance." In re Ordinance 04-75, supra, 192 N.J. at 469. "[A] State mandate embodied in a legislative enactment 'that does not allow for the exercise of municipal discretion cannot be overridden by a referendum.'" Ocean City, supra, 403 N.J. Super. at 356 (quoting In re Ordinance 04-75, supra, 192 N.J. at 469). However, the Legislature must have intended such preemption. Mack Paramus Co. v. Mayor of Paramus, 103 N.J. 564, 573 (1986). The Court has long utilized a five-part test to determine whether the doctrine of preemption applies:

> 1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?
>
> 2. Was the state law intended, expressly or impliedly, to be exclusive in the field?
>
> 3. Does the subject matter reflect a need for uniformity? . . . .
>
> 4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
>
> 5. Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature?

[*Overlook Terrace Mgmt. Corp. v. Rent Control Bd. of W.N.Y.*, 71 *N.J.* 451, 461-62 (1976) (citations omitted).]

We have recognized the pervasive nature of the State's supervision of municipal finances. See *Ocean City*, *supra*, 403 *N.J. Super.* at 363 ("Perhaps state supervision of local affairs is no more fully developed than in the area of municipal finance, where the Legislature has established a comprehensive system pertaining to municipal budgets, debt and salaries."); and see *Roseff*, *supra*, 432 *N.J. Super.* at 10-11 (concluding an ordinance enacted pursuant to the Local Budget Law, *N.J.S.A.* 40A:4-1 to -89, was not subject to a referendum challenge).

Plaintiffs argue that, although the proposed initiative ordinance dealt solely with the police function, it impacted Camden's budget and finances, which are uniquely subject to additional statutory regimes.

MRERA was enacted in 2002. *L.* 2002, *c.* 43, § 75. Since that time, Camden has been subject to its terms. The Legislature found that, with regard to certain municipalities, State aid filled their "structural [financial] deficits" but failed to "function as an economic impetus toward the rebuilding of those municipalities" by addressing the elements needed "to ensure [their] long-term economic viability," including healthcare services, public safety, and "market-rate housing"

that would "expand the local tax base and provide a greater diversity of income levels among municipal inhabitants." N.J.S.A. 52:27BBB-2(j) to (m).

The Legislature intended MRERA to address those needs through "exceptional measures, on an interim basis," to "strategically invest" funds that would help the subject municipalities achieve such viability. N.J.S.A. 52:27BBB-2(n), (o). MRERA requires the State Treasurer to prepare "an economic stimulus package designed to foster the revitalization" of the municipality, along with a "project list" and a specification of costs. N.J.S.A. 52:27BBB-44.1, 44. In addition, upon notice by the Commissioner of DCA of a municipality's eligibility, the Governor appoints a "chief operating officer [(COO)] in consultation with the mayor and the governing body." N.J.S.A. 52:27BBB-7(a). The COO is charged with "reorganizing governmental operations . . . in order to assure the delivery of essential municipal services and the professional administration of that municipal government." N.J.S.A. 52:27BBB-3. The goals are "municipal rehabilitation" and "economic recovery," pursuant to a "strategic revitalization plan" that also addresses "regional issues, including public safety." N.J.S.A. 52:27BBB-6, -29, -38 and -40.

The COO serves during a "rehabilitation term" of five years, N.J.S.A. 52:27BBB-2.2(a), -6(a), -7(c)(1), although the Commissioner of DCA may extend it upon the COO's recommendation. N.J.S.A. 52:27BBB-3, -7(c). The COO has all the authority allocated by law to the mayor, although the mayor and the governing body retain a degree of participation in budget decision-making. N.J.S.A. 52:27BBB-9, -11, -23, -25. The end of the rehabilitation term marks the expiration of the COO's term. N.J.S.A. 52:27BBB-6(a), -7(c)(1).

During the rehabilitation term, the COO may veto any ordinance or resolution adopted by the governing body, but "the governing body may override the veto by a two-thirds vote of the fully authorized membership thereof." N.J.S.A. 52:27BBB-23(a)(1)(a). If the COO believes the override to be "contrary to the rehabilitation or economic recovery goals which justified the rehabilitation declaration," he or she may submit the matter to the "special arbitrator" for a final and unappealable determination. N.J.S.A. 52:27BBB-23(a)(1)(b). The special arbitrator may uphold the override "only upon a finding that the action is consistent with the rehabilitation and economic recovery of the qualified municipality." Ibid.; see also N.J.S.A. 52:27BBB-5.

In 2007, the Legislature accepted the recommendation of Camden's COO for a rehabilitation term of ten years rather than five. N.J.S.A. 52:27BBB-2.2(c), (d); L. 2007, c. 176, § 1. The Committee asserts in its brief that the ten-year period ended on October 28, 2012. The rehabilitation term is followed by a five-year "economic recovery term." N.J.S.A. 52:27BBB-3, -6(a). During that term the mayor resumes full authority, with certain enhanced appointment and veto power over municipal boards and authorities. N.J.S.A. 52:27BBB-6(b)(1) to (5). However, the municipality remains subject to annual State compliance audits, N.J.S.A. 52:27BBB-6(b)(6), and the financial assistance continues until the municipality no longer meets the eligibility criteria of SMAA. N.J.S.A. 52:27-BBB-6(b)(7).

TAL superseded SMAA. See S. Budget & Approps. Comm., Statement to S. 3118 (Dec. 8, 2011) ("Transitional Aid to Localities replaced three existing municipal aid programs: Extraordinary Aid, Special Municipal Aid, and Trenton Capital City Aid."). TAL funding is a "discretionary aid program." N.J.S.A. 52:27D-118.42a. DLGS was accordingly allowed to impose the same kinds of rigorous and intrusive conditions on a municipality that SMAA had authorized:

> Conditions, requirements, or orders deemed
> necessary by [DLGS] may include, but not be
> limited to, the implementation of
> government, administrative, and operational

> efficiency and oversight measures necessary for the fiscal recovery of the municipality, including but not limited to requiring approval by [DLGS] of personnel actions, professional services and related contracts, payment in lieu of tax agreements, acceptance of grants from State, federal or other organizations, and the creation of new or expanded public services.
>
> [N.J.S.A. 52:27D-118.42a.]

The statutory scheme described seemingly demonstrates the Legislature's decision to fully occupy the field of municipal finance in Camden. The proposed initiative ordinance was not a budget ordinance; yet, it cannot be disputed that elimination of the police force, and Camden's membership in, and support of, a County police force was an integral part of the city's overall financial strategy as mapped out in the various MOU's referenced above. On its face, the statutory scheme does not mandate that Camden enter into a particular regionalized or shared service plan. If it did, the initiative ordinance would be barred. See, e.g., In re Trenton Ordinance 09-02, supra, 192 N.J. at 469 ("A state mandate that does not allow for the exercise of municipal discretion cannot be overridden by a referendum."). Yet, certain provisions of the MRERA, including the powers of the COO during the "rehabilitation term," and the extraordinary device of appointment of a special arbitrator to render unappealable decisions, impliedly leave little room for other

voices to be heard. Perhaps, even the voices of the voters of Camden.

The record before the Law Division and before us consists of several certifications from municipal officials along with voluminous supporting documentation. However, there is nothing provided, for example, from DLGS or DCA regarding the actual implementation of the MOUs and the nature of State oversight as to the provision of municipal services that impact the budget. In other words, the record inadequately explains if adoption of the proposed initiative ordinance creates "an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature[.]" Overlook Terrace Mgmt. Corp., supra, 71 N.J. at 462 (internal quotation marks and citation omitted).

We have been told, without apparent dispute, that the MRERA rehabilitation term has ended. Yet, we cannot state with certainty how the passage of time since the matter was before the Law Division may have changed the municipal landscape, particularly as it relates to the preemption issue.

Therefore, we are compelled to remand the matter to the Law Division for further consideration of whether the various statutory schemes at issue have preempted consideration by the voters of the proposed initiative ordinance in this case. We

leave the conduct of the remand to the sound discretion of the Law Division.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION