NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1074-16T3

JOY DESANCTIS;[1] MICHAEL SEEBECK;
PATRICIA COREA; NOREEN DEAN and
JAMES BEAN,

    Plaintiffs-Respondents,

v.

BOROUGH OF BELMAR; MAYOR &
COUNCIL OF THE BOROUGH OF
BELMAR; COLLEEN CONNELLY,
Borough Administrator of the
Borough of Belmar; APRIL CLAUDIO,
Municipal Clerk of the Borough
of Belmar; and CHRISTINE
GIORDANO HANLON, Monmouth
County Clerk,

    Defendants-Appellants.

> **APPROVED FOR PUBLICATION**
>
> **July 9, 2018**
>
> **APPELLATE DIVISION**

Argued March 20, 2018 — Decided July 9, 2018

Before Judges Fasciale, Sumners and Moynihan.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3550-15.

William W. Northgrave argued the cause for appellants (McManimon, Scotland & Baumann, LLC, attorneys; William W. Northgrave, Ted

---

[1] Plaintiff/respondent Joy DeSanctis passed away on January 16, 2017.

Del Guercio, III, and Frances E. Barto, on the brief).

Kenneth E. Pringle argued the cause for respondents (Pringle Quinn Anzano, PC, attorneys; Kenneth E. Pringle, of counsel and on the brief; Denise M. O'Hara, on the brief).

The opinion of the court was delivered by

MOYNIHAN, J.S.C. (temporarily assigned).

The Borough of Belmar, Mayor and Council of the Borough of Belmar, Borough Administrator Colleen Connolly, and Municipal Clerk April Claudio (collectively defendants)[2] appeal from the Law Division judgments entered against them.

The Mayor and Council of Belmar adopted Ordinance 2015-25 on July 7, 2015, appropriating $4.1 million for the construction of the Fifth Avenue/Taylor Pavilion[3] and authorizing the issuance of bonds and notes totaling $3,895,000 to finance part of the construction. After Belmar voters filed a protest petition pursuant to N.J.S.A. 40:49-27[4] seeking a referendum on the

---

[2] The Monmouth County Clerk advised the court she would not be participating in this appeal.

[3] Superstorm Sandy significantly damaged the original Fifth Avenue/Taylor Pavilion, requiring its demolition.

[4] N.J.S.A. 40:49-27 reads in part as follows:

> Any ordinance authorizing the incurring of any indebtedness, except for current expenses, shall become operative 20 days

(continued)

ordinance, the Mayor and Council approved Resolution 2015-159 on

August 18, 2015, authorizing the placement of the referendum on

the November 3, 2015 ballot.  The resolution provided in part:

> Section 3. [The General] election shall have a referendum on the Ordinance.  In accordance with N.J.S.A. 40:49-10, the question shall be put to the voters as follows:
>
> "To vote upon the public question printed below if in favor thereof mark a cross (x) or plus (+) in the square at the left of the word YES, and if opposed thereto mark a cross (x) or plus (+) in the square at the left of the word NO.
>
> [ ] YES    Shall an ordinance of the Mayor and Borough Council of the Borough of Belmar entitled 'Ordinance 2015-25, []Bond Ordinance Providing for the

_____

(continued)

> after the publication thereof after its final passage, unless within those 20 days a protest against the incurring of such indebtedness shall be filed in the office of the municipal clerk, by a petition signed by registered voters of the municipality equal in number to at least 15% of the number of votes cast in the municipality at the most recent general election at which members of the General Assembly were elected, in which case such ordinance shall remain inoperative until a proposition for the ratification thereof shall be adopted, at an election to be held for that purpose, by a majority of the qualified voters of the municipality voting on the proposition, subject to the provisions of [N.J.S.A.] 40:49-10 to 40:49-12.

[ ] NO    Construction of the Fifth Avenue Pavilion in and by the Borough of Belmar, in the County of Monmouth, New Jersey, Appropriating $4,100,000 Therefor and Authorizing the Issuance of $3,895,000 Bonds or Notes of the Borough to Finance Part of the Cost Thereof'; finally adopted on July 7, 2015, be ratified?"

Section 4. The Clerk is hereby authorized and directed to submit this resolution to the county clerk so the process of placing a referendum on a ballot can begin.

The County Clerk received the resolution and public question on August 19, 2015.[5]

An interpretive statement of the ordinance was not initially included in the passed resolution, although the Borough Administrator testified before the trial court that both she and the Mayor and Council informed a resident at the August 18 meeting that one would be prepared. The Borough Administrator also testified that, after "[i]ndividual members of Council spoke to [her] one-on-one after that meeting, again reiterating their desire that there would be an explanatory

_____

[5] The trial judge indicated on the record that this date was provided in "a certification of Bertha C. Sumick, Special Deputy Monmouth County Clerk." No such certification was provided in the record on appeal, but the parties do not contest the date of receipt.

statement,"[6] she drafted the interpretive statement and "circulated it" to the Borough Attorney, Borough Clerk and Mayor. She submitted the interpretive statement — never voted on by the Mayor and Council — which was received by the County Clerk on August 28, 2015; it read:

> This Ordinance provides for the reconstruction of the [Fifth] Avenue Pavilion, also known as Taylor Pavilion, destroyed by Superstorm Sandy. The pavilion will be one-story and have the same functions and footprint as the prior building. This Ordinance enables the Borough of Belmar to finance the project while obtaining reimbursement from the Federal Emergency Management Agency (FEMA). The short term borrowing is expected to be repaid between 24 to 36 months. This Ordinance was unanimously approved by Belmar Mayor and Council on July 7, 2015.

Plaintiffs DeSanctis and Bean first learned of the interpretive statement on September 9, 2015; that day Bean expressed to the County Clerk his concern about information in the interpretive statement. The County Clerk replied to him on September 17 that she did "not believe there is any legal recourse at this point as to the explanation [in the interpretive statement] in terms of changing the ballot"; the County Clerk mailed those ballots to the public the next day.

---

[6] The parties use "explanatory statement" instead of interpretive statement.

Plaintiffs filed suit on September 22, 2015 seeking judgment declaring the interpretive statement invalid because it was never voted on by the Mayor and Council, thereby depriving plaintiffs and the public an opportunity to comment on and object to its content, which contained "inaccurate, misleading and extraneous information," presenting another ground for invalidation. They also sought removal of the interpretive statement — in whole or part — from the ballot; and a determination of their claim under the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2, including a request for attorneys' fees and costs. We perpend Judge Katie A. Gummer's rulings on these issues, which arise from a series of orders that: (1) held the interpretive statement invalid because it was not submitted to the Mayor and Council for resolution and no such resolution was made, and because it was misleading and contained extraneous information intended to influence — not inform — voters; (2) held defendants violated the CRA by depriving plaintiffs a free and fair election, thus entitling plaintiffs to attorneys' fees and costs; and (3) awarded attorneys' fees and costs and prohibited payment from the Borough of Belmar's Beach Utility Fund.

Judge Gummer found persuasive the holding in <u>Town of Harrison Board of Education v. Netchert</u>, 439 N.J. Super. 164, 186 (Law Div. 2014), and adopted that court's conclusion that an interpretive statement submitted to a county clerk without a resolution by the borough council was invalid. Echoing that holding, which the judge found "well established and consistent with the longstanding tradition of our State and our Country to ensure fairness of our election system," she declared the Belmar interpretive statement invalid. As plaintiffs note in their merits brief, the <u>Netchert</u> court "did not precisely articulate the rationale for [its] holding that [interpretive] statements that are not required by N.J.S.A. 19:3-6 must be adopted by resolution." We review questions of statutory interpretation de novo. <u>Tumpson v. Farina</u>, 218 N.J. 450, 467 (2014).

We follow the well-trod trail of statutory interpretation:

> In construing any statute, we must give words "their ordinary meaning and significance," recognizing that generally the statutory language is "the best indicator of [the Legislature's] intent." <u>DiProspero v. Penn</u>, 183 N.J. 477, 492 (2005); <u>see also</u> N.J.S.A. 1:1-1 (stating that customarily "words and phrases shall be read and construed with their context, and shall . . . be given their generally accepted meaning"). Each statutory provision must be viewed not in isolation but "in relation to other constituent parts so that a sensible meaning may be given to

the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). We will not presume that the Legislature intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit. DiProspero, 183 N.J. at 493.

On the other hand, if a plain reading of the statutory language is ambiguous, suggesting "more than one plausible interpretation," or leads to an absurd result, then we may look to extrinsic evidence, such as legislative history, committee reports, and contemporaneous construction in search of the Legislature's intent. Id. at 492-93.

[Tumpson, 218 N.J. at 467-68 (alterations in original).]

The Legislature provided, in N.J.S.A. 19:3-6, for both the mandatory and permissive inclusion of an interpretive statement:

Any public question voted upon at an election shall be presented in simple language that can be easily understood by the voter. The printed phrasing of said question on the ballots shall clearly set forth the true purpose of the matter being voted upon. Where the question concerns any amendment to the State Constitution, or any act or statute or other legal titles of any nature, the printed phrasing on the ballots shall include a brief statement interpreting same. In event that in any statute the public question to be voted upon is so stated as not clearly to set forth the true purpose of the matter being voted upon and no provision is made in said statute for presenting the same in simple language or printing upon the ballots a brief statement interpreting the same, there may be added on the ballots to be used in voting upon the

> question, a brief statement interpreting the same and setting forth the true purpose of the matter being voted upon in addition to the statement of the public question required by the statute itself.

Although the interpretive statement here is not mandated because the public question does not concern a constitutional matter, the discrete treatment accorded mandatory interpretive statements enlightens our analysis.

Our Supreme Court in Gormley v. Lan, observed N.J.S.A. 19:3-6 "appears to impose [the duty to provide an interpretive statement] mandatorily on the Legislature itself where an amendment to the State Constitution is involved," but considered it "understandable that the Legislature might prefer to leave that task to others. Interpretive statements can be drafted in an infinite variety of ways, and the Legislature may simply have determined that arriving at an acceptable draft was not worth the legislative energy." 88 N.J. 26, 36-37 (1981).

The Court did not expansively treat alternate authorship of interpretive statements. It concluded only the Attorney General was vested with the "discretion to determine whether an interpretive statement should be added to the ballot under N.J.S.A. 19:3-6, as well as the content of the statement

itself," id. at 44, reading other statutes in pari materia with N.J.S.A 19:3-6[7]:

> Cognate statutes in L. 1930, c. 187, the act that is the source for N.J.S.A. 19:3-6, deal with the preparation of referendum information to be distributed with sample ballots (N.J.S.A. 19:14-27 through -32). Where the referendum concerns a constitutional amendment, the Attorney General is specifically required to inform the Secretary of State what portions of the State Constitution should be printed and mailed to voters to help them understand "the relation of the amendment submitted to the existing constitution." N.J.S.A. 19:14-29, -30. In addition, the statute authorizes the Attorney General to make a summary statement in order to inform the voters of the effect that adoption or rejection of the question will have on statute law or the State Constitution. N.J.S.A. 19:14-31.
>
> [Gormley, 88 N.J. at 44.]

The Court recognized that the absence of an express authorship grant to the Attorney General in N.J.S.A. 19:3-6 "might be construed to evince an intent to vest the authority under that section elsewhere," but reasoned "the sample ballot provisions [of the 1930 law] reflect a pattern of legislative intent that should be followed in interpreting [that statute]." Id. at 45.

---

[7] "Statutes that deal with the same subject matter or subject should be read in pari materia and construed together as a unitary and harmonious whole." St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15 (2005) (quoting In re Adoption of a Child by W.P. and M.P., 163 N.J. 158, 182 (2000) (Poritz, C.J., dissenting)).

If the Legislature, under N.J.S.A. 19:14-31, granted the Attorney General the discretion to decide if a summary statement should be provided to the public — and if so, the wording of that statement — the Court saw "no reason why the Legislature would have intended a different procedure in the case of [a] brief interpretive statement." Ibid.

The Court specifically excluded the Secretary of State as an alternate interpretive statement author, concluding the Legislature invested no similar authority as that conferred on the Attorney General. Id. at 44. Further, the Court observed "that the Legislature in passing N.J.S.A. 19:3-6 [did not intend] to authorize one of its committees to provide a conclusive interpretive statement when the Legislature itself declined to do so." Id. at 45.

Likewise, we perceive no legislative intent to vest a borough administrator or municipal attorney with the authority to author and submit an interpretive statement with a referendum ballot. While the Attorney General may do so when an interpretive statement is mandated, that authority is derived from the statutory framework pertinent only to that scenario. And the Attorney General may act only when the Legislature declines. Kimmelman v. Burgio, 204 N.J. Super. 44, 54 n.3 (App. Div. 1985).

A-1074-16T3

The statutory scheme also weighs against allowing a mayor and council to outsource an interpretive statement. The referendum procedure of the Home Rule Act — pursuant to which the protest petition here was filed — requires a clerk to submit a petition, once it is found sufficient, "to the governing body of the municipality without delay," N.J.S.A. 40:49-27b, and vests the governing body with the authority to "call a special election therefor," N.J.S.A. 40:49-10. So too, N.J.S.A. 40:69A-120 requires Belmar — a Faulkner Act[8] Small Municipality government — to exercise legislative powers by council.[9]

New Jersey has long recognized that governing bodies

> "must act when assembled at stated or special meetings, and organized with a president to conduct, and a clerk to record, its proceedings. <u>Such body can hardly act in any other manner than by ordinance or resolution</u>. Every act must be by a vote of the members present; and, whether it is called an order, direction or determination, it is still a resolution, because it must be resolved on, upon a motion made by some member." <u>Dey v. Jersey City</u>, 19 N.J. Eq. 412, 416 (Ch. 1869). All through our numerous cases dealing with municipal action, it will be seen <u>that a board or body</u>

---

[8] N.J.S.A. 40:69A-1 to -210.

[9] Although the "legislative power" in a Small Municipality is "exercised by the council," "[t]he mayor . . . participate[s] and vote[s] as other council members" and "preside[s] over all meetings of the council." N.J.S.A. 40:69A-120. We therefore refer throughout this decision to actions by both "mayor and council."

> can act only by ordinance or resolution; these are the alternative methods. Any action of the body which does not rise to the dignity of an ordinance, is a resolution.
>
> [Woodhull v. Manahan, 85 N.J. Super. 157, 166 (App. Div.) (quoting Town of Irvington v. Ollemar, 128 N.J. Eq. 402, 406 (Ch. 1940), aff'd o.b. sub nom. Irvington Nat'l Bank v. Geiger, 131 N.J. Eq. 189 (E. & A. 1942) (emphasis added)), aff'd o.b., 43 N.J. 445 (1964).]

These enactments lead us to conclude that when the Legislature provided the option for an interpretive statement to "be added on the ballots to be used in voting upon [a public] question" that does not clearly set forth its true purpose, N.J.S.A. 19:3-6 — such as the ballot containing the referendum approved by resolution of the Mayor and Council — that interpretive statement had to be approved by the Mayor and Council.

Such a procedure promotes government transparency, a clear legislative aim discerned from reading the Open Public Meetings Act (Sunshine Law), N.J.S.A. 10:4-6 to -21, in pari materia with the statutes we here considered. See Polillo v. Deane, 74 N.J. 562, 574-76 (1977) (acknowledging the importance of allowing voters: to follow the progress of public bodies that can "influence in a material way a person's vote"; and to "have access to the information considered by [such bodies] in

arriving at [a] decision"); <u>McGovern v. Rutgers</u>, 211 N.J. 94, 99 (2012) (acknowledging the Sunshine Law's "clear statement of New Jersey's public policy 'to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way'" (quoting N.J.S.A. 10:4-7)). It is also in line with the liberal construction that must be accorded referendum statutes "for the purpose of 'promot[ing] the "beneficial effects"' of voter participation." <u>Tumpson</u>, 218 N.J. at 468 (alteration in original) (quoting <u>In re Referendum Petition to Repeal Ordinance 04-75</u>, 192 N.J. 446, 459 (2007)).

We previously held the Faulkner Act initiative and referendum provisions, N.J.S.A. 40:69A-184, -185 — which we characterized as "two useful instruments of plebiscite power [which] provide a means of arousing public interest" — should be liberally construed. <u>Twp. of Sparta v. Spillane</u>, 125 N.J. Super. 519, 523 (App. Div. 1973). Our Supreme Court conferred "equally useful" status to the referendum provisions in the Home Rule Act, N.J.S.A. 40:49-27, in holding "we have an obligation to promote, where appropriate, its beneficial effects." <u>Retz v. Saddle Brook</u>, 69 N.J. 563, 571 (1976). If, through the referendum process, citizens are allowed "the right to test a

14                                              A-1074-16T3

challenged ordinance in the crucible of the democratic process," In re Ordinance 04-75, 192 N.J. at 450; see also Tumpson, 218 N.J. at 467, we do not see that submission of an interpretive statement to a county clerk without open approval of the governing body is consonant with the public spirit of the referendum laws.

We want to make clear, our ruling should not be construed to require the Mayor and Council to formulate an interpretive statement that is acceptable to all. Plaintiffs argue the members of the Committee of Petitioners that filed the protest petition were never informed by defendants of the proposed interpretive statement language, depriving them of "an opportunity to object or propose alternative language" to the interpretive statement. While we fully agree the public should be informed of the interpretive statement terms — hence our requirement that the interpretive statement be publicly approved — we point to the Gormley Court's perspicacious observation: "Obviously there can be substantial dispute as to what the true purpose of [a question] is; indeed there may be many 'true purposes.'" 88 N.J. at 37. In light of the knotty possibilities stemming from protracted debate over the interpretive statement language, we leave the final wording to the governing body, subject, of course, to the requirement that

it fairly interpret the public question and set forth its true purpose.  Id. at 37-38.

We also note that a public vote on an interpretive statement will allow objectors to commence court actions earlier than if they learned of the content of same, as they did here, after it is filed with the county clerk.  In the tight electoral time frame, any added time will avoid the rush to the courthouse door, foster a more considered treatment of the issues involved in a challenge, and avoid the expense of the publication — and provision to the voters — of improper interpretive statements.

We agree with Judge Gummer that the never-formally-approved interpretive statement was invalid.

## II

Before analyzing whether attorneys' fees and costs were properly awarded to plaintiffs under the CRA, we must first address the judge's ruling that the interpretive statement was invalid because it was misleading and contained extraneous language; then whether defendants' actions deprived plaintiffs of a substantive right protected by the CRA.

In our review of the interpretive statement, we heed the Gormley Court's caution:

> Rare is the case where the inadequacy of the
> interpretive statement will justify the risk
> of judicial intervention.  That risk inheres
> not simply in the proposal of an alternative

but as well in the mere enjoining of the use of the proposed statement. Either can readily be perceived by one side or the other as both prejudicial to their cause and partial to that of their adversary.

[Id. at 39.]

Our highly deferential review is grounded in "settled principles of law" and "the glaring inappropriateness of judicial management and supervision of such matters." Id. at 38. The Court explained, "When within the scope of legislatively-delegated authority, administrative agents' actions are presumptively valid, and where that authority confers discretion upon those agents, their actions will ordinarily not be overturned by the courts unless they are manifestly corrupt, arbitrary or misleading." Ibid.

The Legislature made clear its intent that an interpretive statement be "a brief statement interpreting [the proposed public question] and setting forth the true purpose of the matter being voted upon." N.J.S.A. 19:3-6. We previously recognized that the legislative aim was not focused on

whether advocates on one side of the issue might prefer that the Act's description be phrased differently to better enhance their political position. In short, we may intervene in such a circumstance only when the interpretive statement is so unclear as to preclude the voters' understanding of the true purpose of the question or so substantially unbalanced as to be biased.

> [<u>McKenzie v. Corzine</u>, 396 N.J. Super. 405,
> 418-19 (App. Div. 2007).]

As we discussed, the <u>Gormley</u> Court anticipated that there can be "substantial dispute" as to a public question's "true purposes."  88 N.J. at 37.  Even so, the Court distilled the "simple and clear" "spirit of the statute": "the brief statement is to be added to help the voter understand more about the amendment than the public question tells him, for the purpose of aiding him in his decision."  <u>Ibid.</u>  And it must also be fair. <u>Id.</u> at 38.

Only the last three sentences of the interpretive statement are challenged:

> 1.   This Ordinance enables the Borough of Belmar to finance the project while obtaining reimbursement from the Federal Emergency Management Agency (FEMA).
>
> 2.   The short term borrowing is expected to be repaid between 24 to 36 months.
>
> 3.   This Ordinance was unanimously approved by Belmar Mayor and Council on July 7, 2015.

Both the content and context of these sentences manifest their misleading nature, rendering the statement so unclear as to preclude the voters' understanding of the true purpose of the question, and so substantially unbalanced as to be biased, thus requiring its invalidation.

The Borough Administrator testified that she "was very careful in how [she] structured the [first] sentence because [she] did not specifically want to say that all of the costs would be reimbursed."  She contended she "simply said [the project would be financed] as we pursue funding" from FEMA. But, as Judge Gummer noted, the first sentence indicates that the ordinance would enable the Borough to finance the construction "while obtaining reimbursement" as if reimbursement was a foregone conclusion.  That is misleading.  The Borough Administrator knew the Borough was going to pursue funding; the interpretive statement, however, disguised the uncertainty of that funding, connoting to voters that the incurred indebtedness would not ultimately be borne by them.

The judge found the second sentence to be unclear because "a voter could interpret that as meaning that everybody expects . . . to be repaid, or that someone, some omniscient person may expect the short[-]term borrowing to be repaid."  Standing alone, the sentence is a fair explanation of the expected repayment schedule; we see no reason why deference should not be extended to this provision.  To the extent, however, the second sentence buttresses the misleading nature of the first sentence — that the indebtedness would be repaid — we look at it askance.

Judge Gummer credited the Borough Administrator's testimony that the last sentence was added to the interpretive statement "at the suggestion of certain members of the Council, who thought it was a matter of importance that the public know that the vote on the referendum was not contentious or on the ordinance was not contentious." The judge found that "[t]he only purpose . . . for that last statement was . . . a means of persuasion to indicate to the voters that the Mayor and the entire Council was unanimous. It does not inform them as to the substance of the issue put before them." We wholly concur.

Most of the brief interpretive statement was designed to sway — not inform — voters in defendants' attempt to finance construction of the pavilion. This was their fourth attempt to garner public support for the project.[10] Despite knowing that FEMA funds were not secured — albeit perhaps obtainable — the Borough Administrator's wording of the interpretive statement conveyed to voters a misleading sense that funding was readily available. And the intent of the last sentence was a blatant attempt to influence voters by presenting a unified front, in clear contravention of the interpretive statement statute's

---

[10] According to the verified complaint, the Borough attempted to finance construction three other times, but the attempts failed due to judicial intervention, voter referendum and citizen outrage, respectively.

spirit and letter.[11]  Lest we forget, defendants submitted the interpretive statement without a public vote.  These actions derogated what our Supreme Court held to be a substantive right protected by the CRA.  Tumpson, 218 N.J. at 472-86.

We need not repeat the Court's comprehensive and penetrating analysis in Tumpson, determining a municipal clerk who refused to file a protest petition — proffered pursuant to the Faulkner Act version[12] — deprived the petitioners of their substantive right of referendum under the CRA.  Id. at 459-60, 486.  We are unpersuaded by defendants' attempt to distinguish Tumpson.  Defendants were required — as were the Tumpson defendants under the Faulkner Act, N.J.S.A. 40:69A-185, -187, -191, see Tumpson, 218 N.J. at 478 — to ascertain if a petition meets the statutory criteria and, if sufficient, to place the challenged ordinance before the voters, N.J.S.A. 40:49-27b.

The fact that the interpretive statement in issue was permissive does not negate that defendants had a binding obligation to submit to the voters — once defendants chose to do so — a statement that was fair, and not misleading and biased. The "right to referendum is about enfranchisement, about self-

---

[11] Even if the defendants acted in good faith, plaintiffs are still entitled to relief under the CRA.  Tumpson, 218 N.J. at 485.

[12] N.J.S.A. 40:69A-185.

A-1074-16T3

government, and about giving citizens the right to vote on matters of importance to their community." Tumpson, 218 N.J. at 480. That right — found substantive by the Court — is meaningless if a governing body can alter that right by submitting a manipulative interpretive statement to the electorate. In determining whether the Faulkner Act referendum provision conferred substantive rights, the Court applied a three-part test whereby

> plaintiffs must establish that (1) the referendum statutes were intended to confer a "benefit" on plaintiffs as a representative class of voters of [the municipality]; (2) the statutory right to challenge an ordinance and place it before the voting public is not "so 'vague [or] amorphous' that its enforcement would strain judicial competence"; and (3) the Faulkner Act "unambiguously impose[s] a binding obligation" on [the municipality]. Cf. Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).
>
> [Tumpson, 218 N.J. at 477 (second and third alterations in original).]

We note the Supreme Court has recently refined the three-part test outlined in Tumpson to determine whether a statute confers substantive rights for the purpose of establishing a CRA claim, holding,

> a court must determine: (1) whether, by enacting the statute, the Legislature intended to confer a right on an individual; (2) whether the right "is not so 'vague and amorphous' that its enforcement would strain

judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation on the [governmental entity]."

> [Harz v. Borough of Spring Lake, ___ N.J. ___, ___ (2018) (slip op. at 19-20) (alterations in original) (quoting Tumpson, 218 N.J. at 475) (citing Gonzaga Univ. v. Doe, 536 U.S. 273, 283-84 (2002)).]

This change however does not alter Tumpson's holding that "the Legislature, through the Faulkner Act, clearly intended to confer the right of referendum on the plaintiffs and voters of [the municipality]." Harz, ___ N.J. ___ (slip op. at 22).

This was not, as defendants contend, a mere procedural act of sending an interpretive statement to the County Clerk. The drafting and submission of the misleading interpretive statement violated the right of referendum as much as — although perhaps more furtively — a clerk who refused to file a protest petition. Controverting defendants' argument, plaintiffs established: the referendum statute conferred a right on them as representatives of the Belmar voters; the right to challenge an ordinance and submit a question before the public is not at all amorphous or vague; and N.J.S.A. 40:49-27b — like its Faulkner Act counterpart — imposes a binding obligation on defendants. Tumpson, 218 N.J. at 477-78. They have proven their substantive right, giving rise to this cause of action.

We also reject defendants' contention that plaintiffs "were not deprived of the benefit conferred by N.J.S.A. 40:49-27 the power of referendum since the referendum was received, reviewed and put to a vote without inclusion" of the interpretive statement. In Tumpson, the Court ruled the municipal clerk's refusal to file the protest petition violated plaintiffs' right of referendum even though judicial intervention later compelled the filing. Id. at 481-84. Here, but for Judge Gummer's intervention, the interpretive statement would have been included with the public question. Indeed, as the judge found, the statement was printed in the Asbury Park Press prior to the court's order.[13] Thus defendants deprived plaintiffs of their right to referendum. "That a court comes to [plaintiffs'] rescue does not alter the nature of the earlier governmental deprivation or anticipated deprivation." Id. at 483.

Any other arguments advanced by defendants on this issue are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

---

[13] Counsel for the County Clerk informed the trial court that the interpretive statement was also included with 229 vote-by-mail ballots; although the votes were later stricken by the trial court, the interpretive statement reached these voters. The court did not find this as a fact; while we have no reason to doubt counsel, we will not consider it as competent evidence.

We therefore agree with Judge Gummer that the interpretive statement was invalid because it was misleading and contained extraneous language; and that defendants' actions deprived plaintiffs of a substantive right protected by the CRA.

III

Defendants reprise their arguments relating to the attorneys' fees and costs awarded pursuant to N.J.S.A. 10:6-2(f): absent a retainer agreement between plaintiffs and counsel it was not possible to assess the reasonableness of the fees requested; that the fees and costs were to be borne by the Borough's beachgoers should have been considered in denying a contingency enhancement; and "the beachgoers, as beneficiaries of plaintiffs' efforts in this case, should bear" the awarded fees and costs.

We review fee determinations by trial courts with deference and will disturb them "only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317 (1995); see also Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001). In our review of fees awarded pursuant to fee-shifting provisions, we do consider whether the trial court "sufficiently address[ed] the factors or the framework that [our Supreme Court] established in Rendine." Walker v. Giuffre, 209 N.J. 124, 148 (2012). The Court reposed

discretion in trial courts to establish any contingency enhancement in fee-shifting cases. <u>New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corrs.</u>, 185 N.J. 137, 158 (2005).

Just as she did throughout the case, Judge Gummer, in her comprehensive and well-reasoned oral decision, gave careful treatment to this issue, setting forth and assessing every applicable standard in computing the lodestar fee, costs and the contingency enhancement. Presented with an invoice and numerous certifications of counsel — sufficient evidence from which to analyze this issue, notwithstanding the absence of a retainer agreement — she carefully appraised plaintiffs' counsels' unchallenged billable hours and hourly rates, even excluding excessive briefing hours; reviewed counsels' qualifications and the high quality of the work that earned a successful result; considered the complexity and pace of this litigation; and noted the entirely contingent nature of counsels' compensation which rendered the risk of non-payment high, before awarding a lodestar fee of $36,940, costs of $1131.88 and a twenty-five percent enhancement. We agree with her rationale and conclusions, including her determination that the voters — not the beachgoers — of Belmar were the beneficiaries of plaintiffs' action. We therefore fully uphold her award decision.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1074-16T3